**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

February 18, 2025

Srinivas M. Raju, Esquire
Matthew D. Perri, Esquire
Kyle H. Lachmund, Esquire
Mari Boyle, Esquire
Richards, Layton & Finger LLP
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

Megan Ward Cascio, Esquire
Rachel R. Tunney, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, Delaware 19801

Lewis H. Lazarus, Esquire
Albert J. Carroll, Esquire
Barnaby Grzaslewicz, Esquire
Samuel E. Bashman, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801

> RE: *Enhabit, Inc. et al. v. Nautic Partners IX, L.P. et al.*,
> C.A. No. 2022-0837-LWW

Dear Counsel:

This letter opinion resolves the defendants' motion for reargument and clarification (the "Motion") under Court of Chancery Rule 59(f).[1] On December 2, 2024, I issued a post-trial opinion (the "Opinion") finding in the plaintiffs' favor on claims of breach of fiduciary duty and aiding and abetting breaches of fiduciary duty.[2] The wrongdoing involved the disloyal formation of a competitor by former

---

[1] Defs.' Mot. for Rearg. and Clarification (Dkt. 520) ("Mot.").

[2] Mem. Op. (Dkt. 519). Terms not defined herein have the meanings given in the Opinion.

1

officers of Encompass Home Health who partnered with private equity firms and their principals. As the Opinion explained, fashioning a remedy proved complex because the enterprise borne of the wrongdoing, VitalCaring Group, has languished.

To limit the defendants' ability to benefit from disloyalty, I devised a constructive trust from which funds will be disbursed to the plaintiffs. I imposed an equitable allocation of profits to disgorge ill-gotten gains but preserve the defendants' aspirations to grow the business. This allocation was generally consistent with the methodology proposed by the plaintiffs' expert, with certain modifications to projections that I deemed appropriate given VitalCaring's performance.

The defendants now ask that I reconsider imposing the constructive trust and clarify its scope. After careful thought, I conclude that their request must be denied, except for one needed clarification.

## I. BACKGROUND

The background of this matter is set out in the December 2, 2024 Opinion. This letter decision recounts the facts necessary to resolve the Motion—specifically, those pertaining to the imposition and structure of the constructive trust.

After a seven-day trial, I found that non-parties April Anthony, Luke James, and defendant Chris Walker breached their duties of loyalty to Encompass Health

Corporation and its affiliates.[3]   Their misconduct included usurping corporate opportunities from Encompass.  I also found that defendant TVG NP Homecare Topco, LP ("Topco") and the private equity-affiliated defendants—including Nautic Partners, LLC and The Vistria Group, L.P.—aided and abetted the breaches.[4]  The wrongdoing resulted in the creation of VitalCaring, a competitor to Encompass.[5]

The plaintiffs sought rescissory damages or disgorgement of $462 million— an estimate supported by the work of the plaintiffs' expert, Dr. Marc Zenner.[6] Zenner used underwriting projections Nautic and Vistria prepared for their respective investment committees—Nautic in July 2021 and Vistria in October 2021 and May 2022—to calculate the present value of the expected gains from Nautic and Vistria's investments in VitalCaring.  He deemed the present value of these expected gains to be between $291 million and $462 million using an 11% discount rate.[7]

In the alternative, the plaintiffs requested $157 million in compensatory damages—an approximation of Encompass's expected returns had it pursued the

---

[3] *Id.* at 2, 114.

[4] *Id.* at 37, 114.  The private equity-affiliated defendants are Nautic Partners, LLC, The Vistria Group, LP, Christoper Corey, David Schuppan, and certain funds affiliated with Nautic and Vistria.

[5] *Id.* at 75.

[6] *Id.* at 79.

[7] *Id.* at 79-80.

usurped acquisition opportunities.[8] Zenner calculated a present value of $92 to $157 million in gains from these acquisitions using an 11% discount rate to Nautic's and Vistria's 2021 and 2022 underwriting projections.[9]

But both damages measures suffered from the same flaw: they relied on stale underwriting projections. The future reflected in these projections is wildly inconsistent with VitalCaring's weak actual performance. I therefore found the projections to be an unreliable basis from which to measure damages.

Zenner proposed an alternate approach using a more recent set of projections prepared for Nautic's standard reporting practice in June 2023. These projections better reflect VitalCaring's performance and provide a more dependable starting point to assess potential remedies. Zenner made several adjustments to the projections to address VitalCaring's present state: (1) a lower cost of equity, (2) a higher exit multiple, and (3) additional EBITDA and net debt corresponding to an active M&A pipeline.

I rejected Zenner's suggested cost of equity reduction and adopted the cost of equity used by Nautic, which was based on the use of an accepted valuation

---

[8] *Id.* at 82.

[9] *Id.*

technique.[10] But I accepted Zenner's increased exit multiple and adjustments for M&A to conform to Nautic and Vistria's investment strategy.[11] I concluded that these adjustments produced a more accurate picture of VitalCaring—a risky venture plagued by early struggles that may yet succeed through strategic acquisitions.

After settling upon projections, the next step was to allocate VitalCaring's future gains. My goal was to allow the plaintiffs to recover a portion of VitalCaring's net profits while ensuring that Nautic and Vistria could recover their investment and remain incentivized to grow the business.

Zenner calculated the relative distribution of gains by dividing Nautic and Vistria's total projected gains by the present value of their projected exit proceeds. He did so to approximate the value to these defendants in excess of their capital contributions. But I could not replicate Zenner's allocation method because the projected proceeds, which had been updated using the more recent Nautic projections, were lower than the defendants' capital contributions. The calculation yielded an illogical negative result. I therefore compared Nautic's and Vistria's capital contributions to VitalCaring's total projected equity value at exit.[12] By this

---

[10] *Id.* at 94-95.

[11] *Id.* at 96-100.

[12] *Id.* at 105.

measure, the plaintiffs would be entitled to 43% percent of VitalCaring's proceeds. I devised a constructive trust to allocate the distributions in accordance with my analysis.

On December 9, the defendants filed their Motion. They seek reargument on the constructive trust remedy and clarification on the trust's structure.[13] The plaintiffs filed an opposition to the Motion on December 16.[14]

## II.    ANALYSIS

A party seeking reargument under Court of Chancery Rule 59(f) must meet a heavy burden. The motion will be denied "unless the Court has overlooked a decision or principle of law that would have a controlling effect or the Court has misapprehended the law or the facts so that the outcome of the decision would be affected."[15] "A motion for reargument is not a mechanism for litigants to relitigate claims already considered by the court. Nor may a party present a new argument for the first time in a motion for reargument."[16]

---

[13] *See* Mot. ¶¶ 2-4.

[14] Pls.' Opp'n to Defs.' Mot. for Rearg. and Clarification (Dkt. 523) ("Opp'n").

[15] *Stein v. Orloff*, 1985 WL 21136, at *2 (Del. Ch. Sept. 26, 1985); *see* Ct. Ch. R. 59(f).

[16] *Comcast Cable Commc'ns Mgmt., LLC v. CX360, Inc.*, 2024 WL 4799292, at *2 (Del. Ch. Nov. 13, 2024) (citation omitted).

As a general matter, the defendants say that they "have not had an opportunity to address the constructive trust remedy adopted by the Court in briefing."[17] But the defendants had adequate notice of the constructive trust mechanism. The plaintiffs first raised this remedy in briefing on a motion in limine filed by the defendants.[18] It was further explored in the plaintiff's pre- and post-trial briefing and at trial.[19] The defendants even addressed the proposed constructive trust in their post-trial brief, arguing that it would be improper absent identifiable property, due to the unreliability of Zenner's calculations, and without "the plaintiffs' payment of the defendant's costs in obtaining it."[20]

The defendants identify no controlling question of fact or law that was overlooked in crafting a remedy. The trust's structure was created through the exercise of my discretion to craft an equitable remedy suited to the unique facts of

---

[17] Mot. ¶ 2.

[18] Pls.' Opp'n to Defs.' Mot. in Lim. No. 3 Regarding Evid. of Damages (Dkt. 391) ¶ 21 (discussing that Zenner's calculations support the formation of "a constructive trust").

[19] Pls.' Pre-trial Br. (Dkt. 399) 66 (arguing why equitable remedies including "a constructive trust" were appropriate); Pls.' Post-trial Opening Br. (Dkt. 479) 102-03 (explaining how a constructive trust would permit the plaintiffs to recover a portion of the defendants' projected gains from VitalCaring). The plaintiffs also raised the possibility of an equitable lien in both their pre- and post-trial briefs, which would function similar to a "vertical" constructive trust. *Id.* at 102-03; Pls.' Pre-trial Br. 66.

[20] Defs.' Post-trial Response Br. (Dkt. 485) 91-95 (emphasis omitted).

this case.[21]  "[N]o fact or legal precedent may 'compel' a different result absent a showing of abuse of discretion."[22]

Nevertheless, the defendants raise three objections to the constructive trust remedy.  First, they take issue with the vertical structure of the constructive trust and the timing of its distributions to the plaintiffs.  Second, they ask me to revisit the allocation of proceeds to account for the defendants' cost of capital.  And third, they seek clarification on the potential dilutive effects of future investments.

The first argument rehashes ones previously considered and rejected—though I offer clarification where the Opinion was unclear.  The second was never raised and, even if it had been, the defendants identify no overlooked controlling fact or principle of law.  The third is premature.

## A.    The Equitable Payment Stream

The defendants assert that it is "not clear from the Opinion if the Court intends that Plaintiffs receive 'first dollar' distributions under the constructive trust, or distributions only after [VitalCaring]'s investors have recovered their invested

---

[21] *See Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief."); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("[T]he Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate[.]"); *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993) ("Equitable relief . . ., if appropriate, will be tailored to suit the situation as it exists.").

[22] *Rich v. Chong*, 2013 WL 3353965, at *2 (Del. Ch. July 2, 2013).

capital."[23]   The parties largely debate this assertion as it concerns Nautic's and Vistria's ability to recover certain costs before the plaintiffs receive any portion of an equitable payment stream.  But the defendants' assertion also raises a broader question: what funds comprise the "profits" to be placed into the trust and allocated to the plaintiffs?  I consider these issues sequentially.

### 1. The Trust's Vertical Structure

The defendants contend that I should reconsider awarding the plaintiffs an equitable payment stream before Nautic and Vistria have fully recovered their invested capital.  They previously averred that a constructive trust required "the plaintiffs' payment of the [defendants'] costs in obtaining it."[24]  This argument was considered and rejected.

In the Opinion, I considered whether the constructive trust should be structured horizontally, such that the plaintiffs would only receive a payment after Nautic and Vistria recovered 100% of their capital contributions.[25]  Although that approach was relatively straightforward, I declined to adopt it due to the perverse incentives it would create.  As the Opinion explained, the defect in a horizontal trust

---

[23] Defs.' Mot. ¶ 8.

[24] Defs.' Post-trial Response Br. 91; *see also id.* at 91-95.

[25] Mem. Op. 86-87 (explaining and depicting a horizontal trust structure).

is that Nautic and Vistria would be incentivized only to recover their investments. "They would have no financial motive to generate profits beyond the amount of their capital contributions."[26]

To maintain Nautic and Vistria's incentives to support VitalCaring's growth, I determined that the trust should be "split vertically rather than horizontally."[27] Nautic and Vistria will "recover their capital contributions *while* Encompass receives a fixed portion of the payment stream . . . ."[28] The manner of recovery was clear: "Encompass will fairly recover a portion of VitalCaring's profits until the defendants' exit, at which point exit proceeds will be apportioned, and the trust will cease to exist."[29]

In the Motion, the defendants argue that "[t]he relevant cases uniformly hold that the owners of an asset subject to a constructive trust are entitled first to be repaid for the amounts that they have contributed to obtain or develop the asset."[30] Yet, there is no requirement in law or equity that wrongdoers be reimbursed for their contributions *before* a constructive trust is imposed. The cases cited by the

---

[26] *Id.* at 87; *see supra* note 4 (listing the private-equity affiliated defendants, which are the "PE Defendants" referred to in the Opinion).

[27] Mem. Op. 88-89.

[28] *Id.* at 88 (emphasis added).

[29] *Id.*

[30] Mot. ¶ 14.

defendants speak to the need to reimburse the defendants for amounts they have contributed to obtain or develop the asset.[31] None say that reimbursement concurrent with the plaintiffs' recovery is impermissible.[32] In *PharmAthene, Inc. v. SIGA Technologies, Inc.*, for example, the court awarded an equitable payment stream only after the defendant achieved $40 million in net profits.[33] But the court imposed that upfront payment condition because it was the arrangement the parties had made before the defendant reneged.[34]

The facts of this case create unusual complications. VitalCaring is the product of vast disloyalty that was purposefully aided and abetted by the private

---

[31] *Id.*; *see Agranoff v. Miller*, 791 A.2d 880, 886-87 (Del. Ch. 2001) (conditioning recovery on restoring the purchase price to the fiduciary without reference to timing of such restoration); *Borden v. Sinskey*, 530 F.2d 478, 497 (3d Cir. 1976) (same); *Hogg*, 622 A.2d at 651 (requiring sale proceeds into a constructive trust to be offset by the defendants' costs); *Hannon Armstrong & Co. v. Sumitomo Tr. & Banking Co.*, 973 F.2d 359, 365 (4th Cir. 1992) ("[A] constructive trust . . . exists only upon the actual profits which [the defendant] earned . . . . [The plaintiff] is thus entitled to a sum equal to the actual revenues . . . minus the actual expenses which [the defendant] legitimately incurred as part of that transaction.").

[32] *See supra* note 31 (citing cases).

[33] 2011 WL 4390726, at *42 (Del. Ch. Sept. 22, 2011), *rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013).

[34] The defendants criticize the plaintiffs and court for citing *PharmAthene* because that case was reversed. *See* Mot. ¶ 14 n.5. But the reversal was because the trial court erred by holding that expectation damages were unavailable for the sort of preliminary agreement at issue. *See SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d at 348-51 (Del. 2013). That holding is irrelevant here. 2014 WL 3974167, at *20 (Del. Ch. Aug. 8, 2014), *aff'd*, 132 A.3d 1108 (Del. 2015).

equity-affiliated defendants. The defendants took the plaintiffs' staff, resources, information, and corporate opportunities to construct this competing enterprise. Money damages would not have served this court's remedial goals because there were no profits to disgorge to the plaintiffs.[35] Equity demanded a solution—rooted in the tenets of *Guth v. Loft*—to attend to the possibility of future profits and simultaneously discourage the defendants from tanking the enterprise to leave the plaintiffs remediless.[36] A constructive trust with a vertical structure affords the "flexibility" needed to achieve these ends.[37]

Because the trust's vertical structure maintains the defendants' incentives to drive value, this remedy permits them some possibility of profiting on their invested capital—which is arguably more than they are entitled to under *Guth*.[38] At the same time, the defendants retain some of the downside risk inherent in their investment in

---

[35] *See* Mem. Op. 77 ("The remedial goal is not a compensatory one. It rests instead 'upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.'" (quoting *Guth v. Loft*, 5 A.2d 510 (Del. 1939))).

[36] *See id.* at 87-89; *Guth*, 5 A.2d at 510 ("[A] constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty.").

[37] Mem. Op. 106 (providing a graphic showing the "vertical structure" the constructive trust will take); *see also Hogg*, 622 A.2d at 652 (declaring that the constructive trust "is an equitable remedy of great flexibility and generality").

[38] *See Guth*, 5 A.2d at 510 ("[T]he law . . . denies to the betrayer all benefit and profit.").

the enterprise.[39]  This outcome is imperfect.  Still, it is equitable.  The plaintiffs and defendants will simultaneously receive first dollar distributions so that Nautic and Vistria remain incentivized to promote the business's growth while the ill-gotten gains are disgorged.[40]

### 2.      The Distributed Funds

The defendants' Motion raises another issue regarding the funds to be divided through the constructive trust.[41]  The defendants ask the court to "hold that the 'profits' to which the constructive trust applies extends only to sums distributed to [VitalCaring]'s investors . . . ."[42]  The defendants further assert that they "do not understand Plaintiffs to contend that they get to share in the earnings of [VitalCaring] before they are distributed to Topco."[43]  The plaintiffs' opposition, however, maintains that they read the Opinion to grant them 43% of VitalCaring's profits "on

---

[39] *See* Mem. Op. 88 ("If they choose not to grow the business, they do so at their own peril.").

[40] *See id.* at 106-07.

[41] Mot. ¶ 8.

[42] *Id.* ¶ 19.

[43] *Id.* ¶ 19 n.7.

an as-earned basis."[44]  These diverging interpretations of the Opinion indicate that clarification is needed.[45]

The clarification is partly necessitated by the specifics of VitalCaring's structure, which I understand to follow the typical model for a private equity-backed portfolio company.[46]  Topco is the holding company at the top of the entity stack.[47] Anthony, Nautic, Vistria, and the management team are invested at the Topco level.[48]  Although the parties and Opinion refer to Topco and VitalCaring interchangeably,[49] VitalCaring's operating business occurs below Topco through the target companies it acquires.  I surmise, then, that profits generated at operating

---

[44] Opp'n ¶ 4 n.1, *see also id.* ¶ 5.

[45] Mot. ¶ 19; *see Naughty Monkey LLC v. MarineMax Ne. LLC*, 2011 WL 684626, at *1 (Del. Ch. Feb. 17, 2011) ( "A motion for clarification may be granted where the meaning of what the Court has written is unclear, and such motion is treated, procedurally, as a motion for reargument under Court of Chancery Rule 59(f)."); *see also Gore v. Al Jazeera America Holdings I, Inc.*, 2015 WL 721068, at *1 (Del. Ch. Feb. 19, 2015) (clarifying a portion of a ruling where "additional guidance [wa]s warranted").

[46] *See generally* Simon Witney, *Corporate Governance and Responsible Investment in Private Equity* 7 (Cambridge Univ. Press 2021) (providing a structural chart showing "a typical private equity fund and its portfolio companies").

[47] *See* Anthony Tr. 771 (confirming Topco is "the holding company that operates as VitalCaring Group"); Vinciguerra Tr. 861-62 (same); Walker Tr. 1529 (using "Topco . . . to refer to the platform").

[48] *See* JX 2149 (Topco Cap Table); *see also* Corey Tr. 1126-27 (describing a prospective term sheet for Newco contemplating equity contributions from Anthony, Nautic, and Vistria).

[49] *E.g.*, PTO ¶ 13 ("Since August 2022, Topco has done business under the name VitalCaring Group.").

subsidiary levels are channeled up to Topco, through which proceeds are distributed to investors holding equity at the Topco level.

The constructive trust was not intended to capture as-earned profits at the operating subsidiary level. It was meant to "remove the rewards of the defendants' disloyalty."[50] Topco is a defendant found liable of aiding and abetting breaches of the duty of loyalty. It is jointly and severally liable alongside Nautic, Vistria, and Walker. As such, the trust is designed to allocate proceeds from the *Topco* level to the plaintiffs.[51]

It would arguably be consistent with *Guth* to award the plaintiffs 43% of any proceeds received at the Topco level *before* those proceeds are either distributed to investors or reinvested.[52] Given VitalCaring's dismal state, however, the constructive trust remedy permits reinvestment and additional (presumably debt-financed) acquisitions to grow the business. The projections I adopted in forming the trust assumed that a portion of VitalCaring's profits would be

---

[50] Mem. Op. 88 (citing *Guth*, 5 A.2d at 511) (cleaned up).

[51] The use of the word "profits" in the Opinion was, at times, imprecise and colloquial. *See id.* at 37, 83-84, 89, 90-92, 107.

[52] *See supra* note 38.

reinvested.[53]  Without M&A and reinvestment, there may well be no funds to put in the constructive trust in the first place.

To account for these issues, VitalCaring's profits net of retained earnings (i.e., net of funds put toward debt service and reinvestment) are subject to the constructive trust.[54]  I envision that the trust would include any proceeds flowing through Topco for distribution to investors.  If Topco experiences a liquidity event (e.g., the sale of a subsidiary), those profits—net of debt service and reinvestment—would go into the constructive trust.  Upon a business combination, any funds to be distributed to Topco's investors pro rata would also go into the constructive trust.  And, because Nautic, Vistria, and Walker are jointly and severally liable, any proceeds they

---

[53] Although Nautic's 2023 projections do not assume growth from M&A, they project 16.3% annualized growth in EBITDA.  JX 2422 (Nautic June 2023 Projections).  Absent assumptions for debt-financed acquisitions, it is reasonable to assume that this EBITDA projection reflects some level of reinvestment.  Nautic also assumed that 30% of the core (non-M&A) business would be debt-funded, so I assume some debt servicing costs will be paid out of retained earnings.  *Id.* at 2.  Zenner made similar assumptions.  *See* Zenner Tr. 1953-56 (remarking on EBITDA growth in the June 2023 projections independent of M&A acquisitions); *see also* Zenner Rep. ¶¶ 51-53 (collecting statements from Anthony, Corey, James, and Schuppan to support the assumption that they are willing to extend the company's holding period to target returns).

[54] This includes debt service and reinvestment at any level of VitalCaring's corporate structure, including Topco and its operational subsidiaries.

receive upon an exit from their positions in VitalCaring would be placed into the constructive trust.[55]

The plaintiffs are entitled to 43% of the funds in the constructive trust. They will receive a quarterly payment of any amount due to them from constructive trust, which will be administered by a trustee.

Ideally, this structure will give VitalCaring a chance to thrive, allow Nautic and Vistria to recover their capital contributions, provide some returns to VitalCaring's third-party investors and employees, and grant the plaintiffs a meaningful recovery.

## B. Allocation of Funds

The defendants next ask that I reconsider the 57%-43% allocation of funds placed into the constructive trust.[56]

This allocation was based on an assessment of Nautic and Vistria's expected gains, meaning "the amount they expect to receive above their capital

---

[55] My knowledge gap as to VitalCaring's capital structure and operations leaves me unable to outline the funds flow into the trust in greater detail. I ask the parties to meet and confer about the funds flow while negotiating a proposed order to implement the constructive trust. I have given guidance here for the sake of making those discussions more productive. If there is a dispute, the parties may present their respective positions through letters to the court.

[56] Mot. ¶¶ 20-24.

contributions."[57]   To calculate it, I adopted Zenner's methodology that divided Nautic and Vistria's total expected gains by the present value of their target exit proceeds.[58]  As explained in the Opinion, though, his method proved ineffective as applied to the more recent—and more reliable—projections.[59]

To approximate Zenner's method, I divided VitalCaring's projected equity value at exit from Nautic's and Vistria's capital contributions.[60]  The result provides a rough proxy for the value one could attribute to Nautic and Vistria's return on invested capital (43%).  This proxy was used only to calculate the plaintiffs' allocation of the funds placed in the constructive trust—not to determine the exact dollar amount the defendants may recoup.

The defendants argue that this approach disregards the time value of money because it compares the undiscounted future value of VitalCaring's exit proceeds with the present value of the Nautic's and Vistria's contributions.[61]  In other words,

---

[57] *See* Mem. Op. 89.

[58] *See* Zenner Tr. 1897-99; Zenner Rep. Exs. E.1A-E.1C; *see also* Mem. Op. 102.

[59] Mem. Op. 102-05.  Nautic and Vistria did not project in 2023 that they would recover their capital contributions.  Their expected returns were negative.  The ratio of their expected gains to their total proceeds yielded a negative result.  I could not rationally allocate funds using a negative number.

[60] *Id.* at 105 (stating that this "alternative approach" "provides an intuitive proxy for the total equity value attributable to Nautic's and Vistria's investments").

[61] Mot ¶ 22.

the defendants ask that I account for the cost of capital in assessing these contributions and, consequently, reduce the plaintiffs' share of future net profits.[62]

The defendants are advancing this argument for the first time. They never previously argued that they should be reimbursed for costs beyond the nominal "purchase price[s]" of the usurped acquisitions.[63] Their new theory is thus improper grounds on which to seek reargument.[64]

In any event, the defendants have not identified any overlooked controlling principle of law on this issue. They cite no authority providing that wrongdoers are entitled to reimbursement for their cost of capital in a constructive trust.[65] It is within the court's discretion to proceed otherwise.[66]

The motion for reconsideration is therefore denied on this topic.

---

[62] *Id.*

[63] Defs.' Post-trial Response Br. 92-93 (referencing only the total purchase price for the entities VitalCaring acquired when discussing "actual expenses" to be deducted from a constructive trust); *see also* Defs.' Pre-trial Br. 3, 80-81 (same); *see also* Zenner Tr. 1924.

[64] *See supra* note 15 and accompanying text.

[65] The defendants cite to *Cede & Co. v. Technicolor, Inc.*, where the court addressed the unrelated issue of post-judgment interest. 2003 WL 23700218 (Del. Ch. July 11, 2023), *rev'd in part on other grounds*, 884 A.2d 26, 41-42 (Del. 2005) (observing that the trial court has "broad discretion" to fashion an award of interest).

[66] *See Stephanis v. Yiannatsis*, 1994 WL 198711, at *1, 3 (Del. Ch. May 9, 1994) (explaining that "it is within the discretion of this Court to allow interest on a trustee's advancement of his or her own funds" to acquire a usurped opportunity, even when the trustee pays actual costs in obtaining capital for the trust), *aff'd sub nom. Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275 (Del. 1995).

### C. Future Equity Financing

Finally, the defendants seek clarification on the effect of dilution on the constructive trust. The Opinion did not speak to the effect future equity investments may have on the portion of the trust payable to the plaintiffs. The matter was, and is, a hypothetical one.

The Opinion also asked the parties to confer on a form of order outlining the trust's structure.[67] Consistent with that request, and with the benefit of the above clarification,[68] I invite the parties to confer on a method for addressing dilution in their proposed form of order governing the trust. If they cannot agree, they may submit competing forms of order with briefs (not to exceed 3,000 words) explaining their respective proposals on the trust.

## III. CONCLUSION

"Extraordinary facts will sometimes call for extraordinary remedies."[69] This court faced a remedial challenge, but not one without an equitable solution. The constructive trust to be created appropriately limits the potential for unjust enrichment by the defendants while managing the parties' risks and incentives.

---

[67] Mem. Op. 114.

[68] *See supra* Section II.A.2.

[69] *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 n.18 (Del. Ch. May 11, 2001).

None of the defendants' arguments for revisiting this remedy amounts to a controlling and overlooked fact or principle of law. The Motion is granted only insofar as a clarification on the funds to be placed into the trust is warranted. The Motion is otherwise denied. IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor